Filed 6/28/21  Fincanna Capital v. Cultivation Technologies CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| FINCANNA CAPITAL CORP., | |
| Plaintiff and Cross-defendant, | |
| v. | G058700 consol. w/ G058942 & G058931 |
| CULTIVATION TECHNOLOGIES, INC., et al., | (Super. Ct. Nos. 30-2019-01072088 & 30-2019-01064267) |
| Defendants, Cross-complainants, and Respondents. | O P I N I O N |
| CATANZARITE LAW CORPORATION, | |
| Objector and Appellant. | |
| RICHARD MESA et al., | |
| Plaintiffs, | |
| v. | |
| CULTIVATION TECHNOLOGIES, INC., | |
| Defendant and Respondent. | |
| CATANZARITE LAW CORPORATION, | |
| Objector and Appellant. | |

Appeal from orders of the Superior Court of Orange County, Randall J. Sherman. Affirmed.

Catanzarite Law Corporation, Kenneth J. Catanzarite and Nicole M. Catanzarite-Woodward for Objector and Appellant.

Horwitz + Armstrong, John R. Armstrong and Alexander Avakian for Defendant, Cross-complainant, and Respondent.

* * *

These three consolidated appeals concern Cultivation Technologies, Inc.'s (CTI) motion to disqualify its own legal counsel, the Catanzarite Law Corporation (Catanzarite), in related cases. The trial court granted CTI's disqualification motion relating to two lawsuits, deciding Catanzarite could not represent the following parties (1) CTI; (2) three CTI subsidiaries (Coachella Manufacturing, LLC, Coachella Distributors, LLC, and DS Gen, LLC, hereafter collectively referred to as CTI Subsidiaries); and (3) a group of CTI shareholders bringing a derivative lawsuit. We conclude the trial court was correct and we affirm its disqualification orders.

FACTS

The appellate briefing in this case does not provide any background facts to give context to the current attorney disqualification dispute. We have pieced together the story by reviewing the multiple complaints and the parties' declarations related to six separate lawsuits. The keystone of each lawsuit (and this appeal) is a battle between two groups of shareholders over who controls CTI. Thus, it is helpful to understand the underlying dispute before jumping into a factual summary of the disqualification motion.

I. *Background Facts*

In 2012, Richard Probst and Richard O'Connor were the controlling shareholders and directors of Mobile Farming Systems, Inc., (MFS), an agricultural technology company selling hydroponic growing systems. Anticipating MFS's products and technology would be in high demand during the expected "medical marijuana boom"

2

the corporation convinced new investors to purchase MFS common stock.  In 2015, the MFS board reported to investors that MFS intended to form a subsidiary, CTI, to purchase several acres of land and build a 100,000 square foot building in Coachella, California, to process marijuana and gain "up to $10,000,000 of high margin annual revenues."  The MFS shareholders (who invested over $3 million) believed MFS acquired 28,000,000 shares of CTI common stock and the new corporation would be a wholly owned subsidiary of MFS.

As promised, Probst and O'Connor incorporated CTI, and these two MFS directors, and along with Amy Cooper, became CTI's appointed board of directors. However, for reasons that are unclear, CTI did not become MFS's subsidiary, angering MFS's shareholders.  In addition, CTI not only refused to acknowledge MFS's 28,000,000 shares but also issued 23,000,000 shares of common stock to CTI's "Founders."  The "'CTI Founders Common Stock'" shares were held by Probst, O'Connor, Cooper, TGAP Holdings, LLC, EM2 Strategies LLC, I'm Rad LLC, Cliff Higgerson, Aroha Holdings Inc., and Scott Unfug.  Soon thereafter, CTI's board members began fighting amongst themselves.

In October 2015, Cooper resigned as president, secretary, and board member of CTI.  In February 2016, CTI's remaining board members removed O'Connor from the board.  This was the starting point of the rift between CTI shareholders, creating two factions, the O'Connor Faction (comprised of O'Connor, Cooper, and a group of CTI/MFS shareholders) and the Probst Faction (Probst and the remaining CTI directors). These two groups became locked in a struggle for control over the corporation.

The Probst Faction issued additional shares, gaining more votes for themselves plus more investors.  In 2016, the Probst Faction, which included CTI's controlling board of directors, entered into several agreements with FinCanna Capital Corp. (FinCanna), a Canadian royalty corporation.  Over the next two years, FinCanna loaned CTI nearly $6 million dollars to develop cannabis cultivation, distribution, and

3

extraction operations in California. In 2018, CTI was unable to make its loan payments to FinCanna and several CTI directors resigned.

Meanwhile, the O'Connor Faction and some disgruntled MFS shareholders hired Catanzarite. In total, Catanzarite filed six lawsuits within a one-year period as follows:

(1) The Pinkerton Action. *Denise Pinkerton v. Cultivation Technologies, Inc., et al.,* OCSC No. 30-2018-01018922.

Catanzarite filed this lawsuit on September 14, 2018, on behalf of an elderly woman (via an attorney in fact) who invested all her retirement savings in MFS shares. This shareholder, individually and derivatively on behalf of MFS, asserted CTI, Probst, O'Connor, Cooper, and others involved with CTI, engaged in fraud, conversion, breach of fiduciary duty, conspiracy, fraudulent concealment, and theft of trade secrets.

In addition to damages, this derivative action demanded the cancellation of CTI stock certificates, an injunction preventing the sale of CTI stock, an injunction forcing CTI to stop using MFS's trade secrets, and the payment of punitive damages and attorney fees. For this lawsuit, CTI attorney of record was Winget, Spadafora, Schwartzberg LLP (Winget).

On January 23, 2019, a few days before Catanzarite filed a shareholder derivative action involving CTI shareholders, Catanzarite dismissed several defendants from the Pinkerton Action, including CTI and members of the O'Connor Faction (O'Connor and Cooper). It also deleted causes of action for misappropriation of trade secrets, unfair competition, and declaratory relief against CTI. In August 2019, Catanzarite amended the complaint to remove all shareholder derivative causes of action on behalf of MFS. Thus, the only defendants remaining were members of the Probst Faction (Probst, Justin Beck, I'm Rad, LLC, Robert Kamm, Robert Bernheimer, Irving Einhorn, and Miguel Motta).

4

(2)  The MFS Action.  *Mobile Farming Systems, Inc. v. Cultivation Technologies, Inc., et al.,* OCSC No. 30-2019-01046904.

Catanzarite filed this lawsuit in January 28, 2019, for MFS and "derivatively on behalf of its wholly owned subsidiary [n]ominal [d]efendant [CTI]." MFS asserted it was entitled to file a derivative action because it organized CTI and acquired 28,000,000 shares of CTI common stock, and therefore, CTI was its wholly owned subsidiary.  The complaint asserted MFS contributed assets to CTI (a seedling trailer and a shipping container) and paid start-up costs.  MFS sought cancellation of CTI's shares as well as any "insider loans and transactions."  It alleged CTI owed MFS "$75,007.24 plus accrued interest of $12,444.29" (MFS's start-up loan) and other damages to be proven at trial.  (Underline omitted.)  The complaint sought attorney fees, punitive damages, and interest.  The lawsuit was based on the premise that no CTI shareholders, other than MFS shareholders, had any valid stock or voting rights.

This complaint also asserted the Probst Faction violated Corporations Code section 1507[1] by "preparing, signing and circulating false minutes, issuing securities, transacting business with insiders, [and] borrowing money from insiders and records relating to CTI."  MFS requested that the court enjoin the Probst Faction from operating CTI until the court held a section 709 hearing "to determine the rightful ownership of CTI, its appropriate [b]oard of [d]irectors, and executive structure.[2]

The court initially granted a temporary restraining order (TRO).  According to Probst, the TRO was financially devastating for CTI because "CTI's operations ground

---

[1]   All further statutory references are to the Corporations Code, unless otherwise indicated.

[2]   Section 709 "'was intended to confer upon the superior court the power to determine in a summary proceeding whether or not a particular director or the entire board was or was not properly elected or appointed in order that the corporation can properly function.' [Citation.]" (*Morrical v. Rogers* (2013) 220 Cal.App.4th 438, 457.)

5

to a halt" for several months. Probst declared, "CTI did not have access to its working capital and . . . key customers became aware of the TRO and refused to continue to place orders and the cash flow began to severely suffer."[3] The court dissolved the TRO in May 2019, after holding a section 709 hearing. The court determined MFS was not a CTI shareholder and could not challenge the election of CTI's directors.

In August 2019, the same day Catanzarite amended the Pinkerton Action to be a direct rather than derivative action, Catanzarite also transformed the MFS Action into a direct action. The first amended complaint (FAC) omitted CTI as a party and alleged only direct claims against members of the Probst Faction for breach of fiduciary duty, conversion, misappropriation of trade secrets, and unfair competition.

(3) The Mesa Action. *Mesa, et al. v. Probst, et al.,* OCSC No. 30-2019-01064267.

Catanzarite filed this shareholder derivative class action on April 16, 2019. The complaint asserted the "nature of [the] action" was on behalf of shareholders owning both MFS and CTI shares seeking to "join MFS in a consolidated action with [the MFS Action] and to among other relief, recognize the ownership and control of CTI as held by" four groups of shareholders. (Capitalization and bold omitted.) These shareholder groups included MFS (holding 28,000,000 CTI shares), as well as any MFS shareholders who purchased CTI shares in various offerings. The complaint expressly excluded shares held by Probst Faction members, their attorneys, agents, or affiliates.

Richard Mesa initiated the lawsuit in three capacities: (1) individually as a "shareholder of both" MFS and CTI shares; (2) in a representative capacity on behalf of over 100 similarly situated shareholders; and (3) derivatively on behalf of CTI. The Mesa Action asserted nine causes of action against the Probst Faction and CTI as a nominal defendant. Identical to allegations in the MFS Action, the Mesa Action sought

---

[3] This declaration was prepared in response to Catanzarite's later request for a section 709 hearing in a subsequent CTI shareholder derivative action.

to enjoin the Probst Faction from operating CTI until there could be an expedited section 709 hearing. In addition to damages, the class sought punitive damages and attorney fees.

One month later, Catanzarite amended the complaint to add Cooper and Tom Mebane as plaintiffs and FinCanna as a defendant. More significantly, the complaint's "nature of the action" changed. The class members no longer sought to join the MFS Action or seek recognition of MFS's controlling shares over CTI. Instead, the Mesa Action plaintiffs sought to declare the current CTI directors' meetings and actions void. In particular, the class sought to unravel CTI's financial dealings with FinCanna, who had just foreclosed on CTI's properties. The FAC included two new causes of action, as well as allegations the Probst Faction wrongfully liquidated CTI's assets and that FinCanna should not have initiated foreclosure proceedings. The FAC asserted FinCanna "claims ownership of the extraction facility and CTI's employees have effectively become [FinCanna] employees." Furthermore, it maintained CTI shareholders "have suffered a total loss of their share value of not less than $5,000,000 and millions more in business opportunities. . . ." CTI's attorney of record, Winget, filed an answer asserting the plaintiffs lacked standing or were not qualified to maintain a derivative lawsuit on CTI's behalf. In October 2019, the Mesa Action plaintiffs filed a motion requesting the court appoint a receiver for CTI.

(4) The Cooper Action. *Cooper, et al., v. Cultivation Technologies, Inc.,* OCSC No. 30-2019-01072443.

On May 23, 2019, Catanzarite filed an action directly against CTI on behalf of two CTI shareholders (Cooper and Mebane), who were members of the O'Connor Faction. The previous day, FinCanna had filed a breach of contract action against CTI and CTI Subsidiaries and requested a receivership. The Cooper Action requested the court direct CTI to (1) hold a shareholder's meeting to elect a board of directors; (2) deliver an annual report; (3) appoint an accountant to conduct an audit; and (4) order

7

CTI to pay the costs for an investigation, audit, and costs of the suit. Winget, on behalf of CTI filed an opposition, asserting a shareholder meeting was scheduled for August 2019.[4]

(5) The FinCanna Action Cross-complaint. *FinCanna v. Cultivation Technologies, Inc., et al.,* OCSC No. 30-2019-01072088.

As mentioned, in May 2019, FinCanna filed a breach of contract action against CTI and CTI Subsidiaries. On July 2, 2019, Catanzarite filed a cross-complaint on behalf of CTI and CTI Subsidiaries against FinCanna and three of its directors. Large sections of the cross-complaint appear to have been cut and pasted from the Mesa Action complaint. Catanzarite purported to represent CTI and its subsidiaries.

In Probst's declaration, prepared to oppose the section 709 request in the Mesa Action, he explained Catanzarite's actions in the FinCanna Action created confusion and harm. He noted Catanzarite filed a cross-complaint and propounded discovery against CTI's "primary secured lender" without telling CTI's board "and during a time when FinCanna has not yet served their complaint on CTI due to ongoing settlement negotiations."

(6) The Scottsdale Action. *Cultivation Technologies, Inc., v. Scottsdale Insurance Company,* OCSC No. 30-2019-01096233.

On September 6, 2019, Catanzarite filed this declaratory relief action purporting to represent CTI. In this lawsuit, CTI demanded that its insurance company, Scottsdale, stop providing a defense or indemnity to the Probst Faction defendants in the Mesa Action. The complaint asserted Scottsdale "refused to communicate with the officers and directors elected by the common shareholders of CTI and who are of the position that only they and their elected officers and directors speak for CTI." In the complaint, CTI sought the court's declaration of its rights under the insurance policy and

_____

[4]  On our own motion, we took judicial notice of CTI's opposition filed in the Cooper Action.

8

orders forbidding Scottsdale from providing a defense "unless and until the vote of the disinterested common shareholders of CTI [was] obtained."

We note that immediately before filing the Scottsdale Action, Catanzarite amended the complaints in the first two derivative actions transforming them into direct actions against individuals who were part of the Probst Faction (the Pinkerton and MFS Actions). Additionally, after filing the Scottsdale Action, Catanzarite dismissed the Cooper Action on September 13, 2019.

II. *The FinCanna Action*

Before discussing the disqualification motions, it is helpful to briefly summarize the FinCanna Action. The complaint alleged that in 2016, FinCanna loaned nearly $6 million dollars to CTI. FinCanna asserted it attempted to renegotiate the deal, but after several key CTI members resigned, CTI's "attention and resources [were] devoted to litigation" and "its management [was] in disarray, which pos[ed] further threat to FinCanna's chances of recovery." FinCanna asked the court to appoint a receiver to protect its interests in CTI and order an injunction to stop any interference in the receivership.

FinCanna's complaint specifically referred to the upheaval created by the MFS Action. It explained that in April 2019, it foreclosed on property used as collateral for some of the loan proceeds (recovering nearly $3.9 million). Thereafter, four board members and CTI's Chief Operating Officer (CEO) resigned, leaving two directors. FinCanna explained it filed the lawsuit because it believed that after these resignations, CTI's operations became impaired and the ability to recover the money owed (over $4 million due to owed interest) was "placed in serious risk."

III. *Disqualification Motions*

A. *First Disqualification Motion in the FinCanna Action*

Horwitz + Armstrong (Horwitz) filed a motion on behalf of CTI, the cross-complainant in the FinCanna Action, to recuse and/or disqualify the "purported attorneys

of record." (Capitalization and bold omitted.) Horwitz argued CTI did not retain Catanzarite to represent it and there were unwaivable conflicts of interest. In support of the motion, Probst filed a declaration, "on behalf of [himself] and CTI's duly elected [b]oard of [d]irectors, who have authorized the filing" of the disqualification motion.

Probst declared that at CTI's annual meeting, the shareholders elected himself, Hank Casillas, Michael Burdick, James Lally and Cooper to CTI's board of directors and there were no other shareholder meetings held to elect different officers. Probst explained Catanzarite claimed it obtained "written shareholder consents" to remove CTI's elected board and install different directors, who then hired Catanzarite to represent CTI. Probst submitted a copy of the "written consent promulgated by . . . Catanzarite purportedly removing" all the board members on May 2019. Catanzarite initiated this legal maneuvering after the court ruled against its clients at the section 709 hearing and refused to overturn the board of directors election.

Probst explained, "Rather than holding a shareholder's meeting for the purpose of electing a new [b]oard since Catanzarite knew his clients lacked a sufficient number of shares necessary to win such an election, on May 14, 2019, he instead unlawfully procured a purported 'Majority Written Consent' of CTI's shareholders that removed the entire shareholder-elected and sitting CTI Board and subsequently elected a new board consisting of Catanzarite's true clients who are a faction of CTI shareholders." After providing several reasons why the written consent was "ineffective and unlawful," Probst noted the shareholders' election of O'Connor and Duffy to the board "by way of unanimous written consent" was not effective, and therefore, they were not authorized to act on behalf of CTI or retain Catanzarite as counsel.

In his declaration, Probst stated Catanzarite filed a cross-complaint and answer in the underlying case "despite his having been opposing counsel against CTI and/or its management in at least four other related cases, and despite his personal participation in a proxy battle for control of CTI." He explained Catanzarite recently

10

filed a lawsuit, on behalf of CTI, against the corporation's insurance carrier to withhold coverage. He declared, "It is no coincidence that it is this insurance coverage which is financing the defense of the various parties Catanzarite is suing in the various other matters. This is the essence of conflict of interest: he is challenging insurance coverage for the benefit of one of his clients, which is being used to finance the defense of the multiple lawsuits he has filed."

Catanzarite, on behalf of CTI, filed an opposition and submitted declarations written by Kenneth J. Catanzarite, O'Connor, and several others. Catanzarite also filed evidentiary objections to Probst's declaration. The opposition asserted that removing the Probst Faction from the board and filing a cross-complaint and answer in the FinCanna Action were all "[v]alidly [a]uthorized" actions. Catanzarite asserted its representation of other clients was not adverse to CTI. For example, the Scottsdale Action would directly benefit CTI by preserving the "$3 million Business and Management Indemnity Policy from being depleted by Probst and others who failed and refuse to post the undertaking required by CTI's Bylaws and . . . section 317." Similarly, in the derivative actions, CTI was named as a nominal defendant and the claims "are not asserted against it but instead for the benefit of CTI." Moreover, Catanzarite maintained it requested the receivership to protect CTI's assets.

In its reply, Horwitz addressed Catanzarite's assertion its representation of other clients was not adverse to CTI. "[Catanzarite] cannot ethically represent certain shareholders suing defendant/cross-complainant [CTI] in shareholder derivative actions, shareholder class actions, and making motions to appoint a receiver to control [CTI] *while at the same time* acting as legal/litigation counsel of record *for* CTI directly. Rule of Professional Conduct, rule 1.7 expressly prohibits a lawyer from so representing clients with such direct and adverse interests at the same time. When, as here, the lawyers' clients' interest are so directly adverse, the clients cannot even consent to such joint representation, because it makes the entire judicial machinery appear unfair." On

11

CTI's behalf, Horwitz argued the drastic measure of seeking a receivership in the shareholder derivative Mesa Action was "adverse to the corporation's interests" due to the "extravagant costs." CTI argued the request was "similar to claiming 'we had to destroy the village in order to save it.'"

B. *November 2019 Disqualification Order*

On November 15, 2019, the court granted the motion but did not rule on the evidentiary objections on the grounds they were "not directed at evidence that the court considers material to its disposition of this motion." The court ruled as follows: "Catanzarite's simultaneous representation of CTI and interests adverse to CTI compel the firm's disqualification. In *Flatt v. Superior Court* (1994) 9 Cal.4th 275 (*Flatt*), the California Supreme Court held, 'Courts and ethical codes alike prohibit an attorney from simultaneously representing two client adversaries, even where the substance of the representations are unrelated.' [Citation.] The court added, 'Indeed, in all but a few instances, the rule of disqualification in simultaneous representation cases is a per se or automatic one.' [Citation.] Catanzarite is representing CTI in this case, but in the pending [Mesa Action] Catanzarite is representing one faction of CTI shareholders who have an upcoming motion scheduled seeking to impose a receiver on CTI, relief that would be adverse to CTI. In the pending [Scottsdale Action], Catanzarite represents CTI yet seeks to invalidate a defense and indemnity for CTI directors in the [Mesa Action] under an insurance policy issued on CTI's behalf. A denial of coverage could put CTI on the hook for the individuals' costs of defense and/or liability."

The court cited authority holding an attorney cannot avoid the disqualification rule by "unilaterally converting a present client into a former client before the hearing" on the disqualification motion. The court reached the following conclusions: "In the pending [Pinkerton Action], Catanzarite represents the plaintiffs, and the original [c]omplaint named CTI as a defendant, although the first amended complaint dropped CTI as a party. In the Cooper [Action], Catanzarite represented the

12

petitioners, who sought to compel CTI to hold a shareholders meeting to elect directors. Petitioners dismissed that action on September 13, 2019.  Catanzarite represents the plaintiffs in the [MFS Action], in which the original [c]omplaint alleged in [paragraph] 50 that CTI owes money to the plaintiff [referring to MFS start up loan totaling $87,451.53].  The [FAC] omitted that allegation.  Thus, there are five lawsuits in which the Catanzarite firm is or was adverse to CTI, compelling the firm's disqualification."

Alternatively, the court determined disqualification was warranted because "corporate counsel's professional duties run to the corporation, [and] counsel must refrain from taking part in any controversies or factional differences among shareholders as to control of the corporation."  It noted, "Catanzarite represents CTI's common stockholders, who are fighting with CTI's preferred stockholders in several lawsuits for CTI's control."  Finally, the court explained that in light of the above rulings, "the court need not and will not reach the issue of whether Catanzarite was authorized to represent CTI in this action based on his shareholder faction allegedly being in control of CTI."

C.  *Second Disqualification Motion in the FinCanna Action*

Less than a week later, Horwitz filed a motion to recuse and/or disqualify Catanzarite from representing the CTI Subsidiaries in the FinCanna Action.  The motion asserted CTI and the CTI Subsidiaries should be treated as the same client for conflict purposes.  Horwitz explained that after the court's disqualification ruling, it asked Catanzarite to voluntarily withdraw from representing the CTI Subsidiaries.  Catanzarite refused, stating it intended to appeal the prior disqualification order.[5]

Catanzarite filed an opposition, confirming it intended to file an appeal.  It argued Horwitz filed an "abusive disqualification motion[]" brought "solely for the improper and strategic purpose to leave the CTI Subsidiaries without their counsel of choice."  The hearing was scheduled for January 2020.

---

[5]        Before the trial court considered CTI's second motion, Catanzarite, representing itself, filed a notice of appeal from the November disqualification order.

13

D. *Two Disqualification Motions in the Mesa Action*

Catanzarite's appellant's appendix does not include one of the disqualification motions filed in the Mesa Action. On our own motion, we augmented the record on appeal to include missing documents.[6] (Cal. Rules of Court, rule 8.155(a)(1)(A).) Horwitz filed a motion on behalf of CTI. Several members of the Probst Faction, who were named defendants in the Mesa Action (Beck, Miguel Motta, Robert Bernheimer, Robert Kamm, Eric Mathur, Robert Schmidt, and Jason Pitkin, hereafter referred collectively and in the singular as Beck), filed a motion to "join in" CTI's motion. Beck was represented by attorneys from O'Hagan Meyer LLC.

Our record contains Catanzarite's oppositions to these motions, filed on behalf of the Mesa Action plaintiffs. Catanzarite addressed the merits of CTI's motion. However, Catanzarite argued Beck's motion was procedurally improper because the November disqualification order stayed all the lawsuits, and Beck did not ask for permission to file the joinder motion. In addition, Catanzarite argued Beck's motion raised different issues from CTI and should be treated as a separate independent motion for disqualification. It noted a separate motion would be untimely filed because the hearing on CTI's motion was scheduled for early January.

E. *January 2020 Disqualification Orders*

On January 10, 2020, the court considered the two disqualification motions filed in the Mesa Action, as well as the CTI Subsidiaries' motion filed in the FinCanna Action. It ruled as follows: "The [m]otions to [d]isqualify [Catanzarite] in the four related cases are granted in [the Mesa Action and the FinCanna Action] and denied in

---

[6] We caution counsel that it is not this court's responsibility to obtain the documents necessary to consider the arguments raised on appeal. We have used our discretionary authority to take judicial notice of documents discussed by the parties and augment the record to assist us in reviewing the appeals on their merits. But we are not required to do so. (See *State Comp. Ins. Fund v. WallDesign Inc*. (2011) 199 Cal.App.4th 1525, 1529.)

14

[the Pinkerton Action and the MFS Action]. [¶] This court previously granted a motion to disqualify [Catanzarite] from representing CTI in the FinCanna [Action] because principles prohibiting dual representation prohibit [Catanzarite's] simultaneous representation of CTI and interests adverse to CTI. In [the Mesa Action] Catanzarite is representing the plaintiffs in a derivative action on behalf of CTI, meaning that its representation is for the benefit of CTI. Thus, the same principles that warranted Catanzarite's disqualification in the FinCanna [Action] apply to [the Mesa Action] and compel disqualification here."

As for the CTI subsidiaries, the court ruled as follows: "Here, the FinCanna plaintiff sued CTI and its three wholly-owned subsidiaries, alleging that plaintiff loaned CTI $5.9 million and that CTI still owes plaintiff about $4.7 million. Plaintiff's theory against the subs[idiaries] is that they owe CTI money . . . . Thus, the [three subsidiaries'] liability to plaintiff is dependent on CTI owing plaintiff money, and as a result all four defendants have a unity of interest in the case. Catanzarite filed an [a]nswer and [c]ross-[c]omplaint on behalf of all four named defendants. The [c]ross-[c]omplaint is based primarily on the relationship between FinCanna and CTI, with little reference to the subs[idiaries], and alleges all of its causes of action jointly on behalf of all four cross-complainants, without any distinction as to any of the allegations, or in any of the six causes of action or in the prayer as to which cross-complainants are seeking what relief. Thus, all four of the defendants and cross-complainants have a unity of interest in the FinCanna [Action], warranting Catanzarite's disqualification from representing the subs[idiaries], on the heels of being disqualified from representing CTI."

The court denied the motion with respect to the Pinkerton Action. It noted the case was originally a derivative action on behalf of MFS, but Catanzarite amended the complaint and CTI was no longer a party in this lawsuit. The court concluded CTI, therefore, lacked standing to seek Catanzarite's disqualification from representing MFS

15

shareholders against defendants other than CTI "even if the allegations involve the world of CTI."

Likewise, the court determined CTI lacked standing in the MFS Action. Although the complaint "originally asserted derivative claims on behalf of CTI, and named CTI as a nominal defendant," the FAC omitted CTI as a party. The court noted, "CTI (through other counsel) filed a cross-complaint against MFS which is still pending. Although MFS alleges it was and is CTI's sole shareholder, the court ruled at a [section] 709 hearing in April 2019 that MFS was not a CTI shareholder as of November 2018." The court concluded, "Although Catanzarite represents MFS as a cross-defendant, there is no dual representation involved, and Catanzarite's disqualification from representing MFS is not warranted."

The court denied Beck's joinder motion as being untimely filed. It added, "The moving parties also lack standing to seek Catanzarite's disqualification from representing the parties that firm represents." The court granted Catanzarite's requests for judicial notice and ruled on some of Catanzarite's evidentiary objections. The court stayed the Mesa Action pending the appeal. It vacated all future motions scheduled in the case including a motion to appoint a receiver.

IV. *Appellate Procedural History*

Catanzarite, representing itself, filed a notice of appeal from the November disqualification order (G058931 [the FinCanna Action]), and it filed two notices of appeal challenging the January order (G058700 [additional disqualification in FinCanna Action]; G058942 [disqualification in the Mesa Action]). We granted Catanzarite's request to consolidate its two appeals related to the FinCanna Action (G058700 & G058942), and on our own motion consolidated Catanzarite's appeal from the disqualification order in the Mesa Action (G058931). None of Catanzarite's clients filed appeals. CTI filed its respondent's brief in support of the disqualification orders.

16

DISCUSSION

This case raises issues related to motions to disqualify Catanzarite, a law firm filing six lawsuits while simultaneously representing two corporations, three corporate subsidiaries, and a group of minority shareholders of both corporations. Specifically, the corporate entities are the following: (1) MFS, the plaintiff in the MFS Action, (2) CTI, the cross-complainant and defendant in the FinCanna Action, (3) CTI Subsidiaries, the cross-complainants and defendants in the FinCanna Action, and (4) CTI, the plaintiff in the Scottsdale Action. The minority shareholders groups include members of the O'Connor Faction as follows: (1) Pinkerton, a MFS shareholder and plaintiff in the Pinkerton Action; (2) Mesa, Cooper, Mebane and a class action of shareholders, all plaintiffs in the Mesa Action; (3) Cooper and Mebane, who are MFS/CTI shareholders and plaintiffs in the Cooper action.

No party appealed from the orders denying Catanzarite's disqualification in the MFS and Pinkerton Actions. Catanzarite, representing itself, seeks to reverse the disqualification orders regarding the firm's representation of CTI, CTI Subsidiaries, and the Mesa Action plaintiffs. Accordingly, this opinion will be limited to our review of the orders regarding those three concurrently represented clients.

I. *Applicable Law*

A. *Attorney Disqualification Generally*

"A trial court's authority to disqualify an attorney derives from the power inherent in every court '[t]o control in furtherance of justice, the conduct of its ministerial officers, and of all other persons in any manner connected with a judicial proceeding before it, in every matter pertaining thereto.' [Citations.]" (*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1145 (*SpeeDee Oil*); Code Civ. Proc., § 128, subd. (a)(5).)

"Disqualification motions implicate competing considerations. On the one hand, these include clients' rights to be represented by their preferred counsel and

17

deterring costly and time-consuming gamesmanship by the other side. . . . [¶] Balanced against these are attorneys' duties of loyalty and confidentiality and maintaining public confidence in the integrity of the legal process. . . . [Citation.] 'The loyalty the attorney owes one client cannot be allowed to compromise the duty owed another.' [Citation.]" (*Banning Ranch Conservancy v. Superior Court* (2011) 193 Cal.App.4th 903, 911 (*Banning Ranch*).)[7]

B. *Standard of Review*

"Generally, a trial court's decision on a disqualification motion is reviewed for abuse of discretion. [Citations.] If the trial court resolved disputed factual issues, the reviewing court should not substitute its judgment for the trial court's express or implied findings supported by substantial evidence. [Citations.] When substantial evidence supports the trial court's factual findings, the appellate court reviews the conclusions based on those findings for abuse of discretion. [Citation.] However, the trial court's discretion is limited by the applicable legal principles. [Citation.] Thus, where there are no material disputed factual issues, the appellate court reviews the trial court's determination as a question of law. [Citation]." (*SpeeDee Oil, supra,* 20 Cal.4th at pp. 1143-1144.)

C. *Successive vs. Concurrent Representation*

"There are different disqualification standards for attorneys who have conflicts with former clients and those who have conflicts with current clients. As to conflicts involving successive representation with former clients, courts look to whether there is a 'substantial relationship' between the subjects of the current and the earlier

---

[7] "'"Normally, an attorney's conflict is imputed to the law firm as a whole on the rationale 'that attorneys, working together and practicing law in a professional association, share each other's, and their clients', confidential information.'" [Citation.]" (*Beachcomber Management Crystal Cove, LLC, v. Superior Court* (2017) 13 Cal.App.5th 1105, 1116 (*Beachcomber Management*). Accordingly, the disqualification ruling made as to Catanzarite is binding on the associates of that firm.

proceedings. [Citations.] [¶] In contrast, there is a more stringent standard when an attorney simultaneously represents two current clients with conflicting interests. Disqualification . . . is *mandatory* in such circumstances even though the simultaneous matters may have nothing in common. (*Flatt, supra,* 9 Cal.4th at p. 284.) '"Something seems radically out of place if a lawyer sues one of the lawyer's own present clients on behalf of another client. Even if the representations have nothing to do with each other, so that no confidential information is apparently jeopardized, the client who is sued can obviously claim that the lawyer's sense of loyalty is askew."' [Citation.]" (*Banning Ranch, supra,* 193 Cal.App.4th at pp. 911-912; see Rules Prof. Conduct rule 1.7(a) & (b) [attorney may not without informed written consent "represent a client if the representation is directly adverse to another client in the same or a separate matter" or "there is a significant risk the lawyer's representation of the client will be materially limited by the lawyer's responsibilities to or relationships with another client"].)

In summary, courts recognize the "chief fiduciary value jeopardized" in cases involving successive representation is client confidentiality. (*M'Guinness v. Johnson* (2015) 243 Cal.App.4th 602, 613.) Whereas in concurrent "representation of multiple clients resulting in a conflict of interest" the "'primary value at stake'" is the attorney's duty and "the client's legitimate expectation" of loyalty, not confidentiality.[8]

D. *Corporate Counsel*

Corporate counsel's professional responsibilities and allegiances are owed to the corporate entity, not the officers, directors, or shareholders "and the individual shareholders or directors cannot presume that corporate counsel is protecting their interests. [Citations.]" (*La Jolla Cove Motel & Hotel Apartments, Inc. v. Superior Court* (2004) 121 Cal.App.4th 773, 784 (*La Jolla Cove*).) Generally, a lawyer representing a

---

[8] This case involves issues related to concurrent representation, invoking the fiduciary duty of loyalty, rather than confidentiality. For this reason, we will not discuss any of Catanzarite's arguments about maintaining client confidentiality.

19

corporation may also represent any of the corporation's officers or directors upon the clients' written consent.  (*Id.* at p. 785; see Rules Prof. Conduct rule 1.13(g).)

"Conflicts of interest between a corporation and its officers, directors and shareholders are particularly problematic for corporate counsel where . . . the corporation is a closely held one, with few shareholders.  [Citation.]  Corporate counsel may develop a fiduciary relationship with individual shareholders or directors.  However, even in that situation, the attorney's ultimate loyalty is to the corporation, not individual shareholders, officers or directors.  [Citation.]  Thus, where an adversarial setting presents itself, pitting the corporation against one or more of its officers, directors or shareholders, corporate counsel may still represent the corporation against those individuals, even though he or she may have received confidential information about them in the course of representing the corporation.  [Citations.]"  (*La Jolla Cove, supra,* 121 Cal.App.4th at p. 785.)

However, "[O]nce a conflict has arisen between a corporation and one or more of its officers, directors or shareholders, corporate counsel may not simultaneously represent the corporation and the adverse officer, director or shareholder."  (*La Jolla Cove, supra,* 121 Cal.App.4th at p. 785; see Rules Prof. Conduct rule 1.7.)  "Thus, where a shareholder has filed an action questioning [the corporation's] management or the actions of individual officers or directors, such as in a shareholder derivative or . . . dissolution action, corporate counsel cannot represent both the corporation and the officers, directors or shareholders with which the corporation has a conflict of interest.  [Citation.]"  (*Id.* at pp. 785-786.)

Consequently, there can be no dual representation of a corporation and directors when the suit is brought by other shareholders.  "In an action by a shareholder alleging *harm to the corporation*, an attorney cannot represent both the corporation and defendant shareholders who are accused of wrongdoing or whose interests are otherwise adverse to the corporation.  This is so whether or not the suit is framed as a derivative action."  (Friedman, Cal. Practice Guide: Corporations (The Rutter Group 2021)

20

¶ 1:11.2a; see *Ontiveros v. Constable* (2016) 245 Cal.App.4th 686, 696-699, [attorney could not represent both corporation and 60 percent shareholder in derivative action brought by 40 percent shareholder]; *Blue Water Sunset, LLC v. Markowitz* (2011) 192 Cal.4th 477, 488-489, [attorney could not represent both LLC and defendant member in derivative action brought by LLC's only other member]; *Gong v. RFG Oil, Inc.* (2008) 166 Cal.App.4th 209, 216 (*Gong*) [attorney cannot represent both 51 percent shareholder and corporation in suit by 49 percent shareholder alleging personal use of corporate funds and other claims showing harm to corporation].)

Of course, the case before us involves the opposite scenario. Not surprisingly, we found no cases (and Catanzarite cites to none) holding an attorney may simultaneously represent both the corporation and the *plaintiff shareholders* who are accusing the board of directors of wrongdoing. The lack of authority can be explained by the existence of well-settled legal authority holding a derivative plaintiffs' attorney does not ipso facto represent the corporation, but rather "the shareholder's attorney is acting *against* the corporation's wishes." (*Shen v. Miller* (2012) 212 Cal.App.4th 48, 57-60, italics added (*Shen*).) In order for a shareholder to have standing to bring a derivative action, counsel must plead the corporation refused to pursue the claim. (*Id.* at pp. 57-58.) For this reason, in a shareholder derivative suit the corporation is included as a nominal defendant because it is in conflict with the outsider shareholder about the advisability of suing. (*Id.* at p. 58.)

Moreover, "[T]he corporation that is the subject of the derivative claim is generally a nominal party only. '"Because the claims asserted and the relief sought in [the derivative] complaint would, if proven, advance rather than threaten the interests of the nominal defendant[], the nominal defendant[] must *remain neutral* in [the] action." [Citation.]' [Citation.]" (*Shen, supra,* 212 Cal.App.4th at p. 58, italics added.) Logically, if the derivative plaintiffs' attorney also represented the corporation, there would be no need for a derivative action because "the corporation itself would be

21

pursuing" the outside shareholder's claims. (*Ibid.*) An attorney representing plaintiff shareholders cannot both advocate those claims and remain neutral. Concurrent representation of clients with such obvious conflicting interests is not permissible.

II. *Analysis of Disqualification Order in the FinCanna Action*

To briefly summarize, the trial court disqualified Catanzarite from representing CTI on the grounds it was simultaneously representing "two client adversaries."[9] It reasoned Catanzarite was representing CTI in the FinCanna Action but representing a faction of CTI shareholders in the Mesa Action. Moreover, the court determined Catanzarite improperly took sides in a shareholder dispute by filing the Scottsdale Action to promote the interests of the O'Connor Faction by stopping CTI's insurance company from providing a defense or indemnity to the Probst Faction defendants in the Mesa Action. On appeal, Catanzarite asserts the court abused its discretion in making this ruling because the moving party lacked standing and its clients did not have adversarial interests. We address each contention separately, concluding both lack merit.

A. *Standing*

Catanzarite's first and primary challenge to the trial court's ruling is that the party filing the disqualification motion lacked standing. Catanzarite asserts the trial court could not possibly decide this issue without first resolving the parties' complicated dispute about which shareholder faction rightfully controlled CTI. Catanzarite provides a lengthy argument supporting its theory the O'Connor Faction controlled CTI. It argues the court abused its discretion by failing to consider and agree with its contentions. Not

---

[9] On appeal, Catanzarite does not challenge the trial court's conclusion CTI and CTI Subsidiaries had a unity of interest in the FinCanna Action. Catanzarite, conceding that the same principles regarding its representation of CTI apply equally to CTI Subsidiaries, does not distinguish between them in its legal discussions. We will do the same for purposes of this opinion; our discussion of CTI applies equally to CTI Subsidiaries unless otherwise indicated.

22

so.  CTI had standing to file the motion because all the facts relevant to the issue of disqualification were undisputed.  There was no need for the court to prematurely consider and resolve other factual disputes (rending many causes of action moot before trial).

"A 'standing' requirement is implicit in disqualification motions.  Generally, before the disqualification of an attorney is proper, the complaining party must have or must have had an attorney-client relationship with that attorney.  [Citation.]"  (*Great Lakes Construction, Inc. v. Burman* (2010) 186 Cal.App.4th 1347, 1356.)

Catanzarite is in the awkward position of asserting it had an attorney-client relationship with CTI for purposes of filing complaints in the Scottsdale and FinCanna Actions, but not with CTI for purposes of a disqualification motion.  To avoid this conundrum, Catanzarite frames its lack-of-standing argument on the premise there was never an attorney-client relationship between itself and members of the Probst Faction.  We agree the Probst Faction never entered into an attorney-client relationship with Catanzarite.  Instead, the Probst Faction, the directors purportedly controlling CTI, hired Horwitz to act as corporate counsel for CTI, i.e., the same corporate entity Catanzarite claims to represent.  Catanzarite cannot avoid the undisputed fact it was not the only law firm representing the corporation in litigation.  Indeed, Winget was CTI's attorney of record in the three derivative actions filed by Catanzarite.[10]

The problem with Catanzarite's lack-of-standing argument is that it ignores the fact CTI is not an individual, but rather an inanimate corporate entity having a board of directors with authority to hire corporate counsel.  Catanzarite's authority to represent CTI arose from its relationship with the O'Connor Faction.  Yet, as discussed at length in

---

[10]    It is noteworthy that CTI's directors who were members of the Probst Faction hired Winget to defend CTI in the three shareholder derivative actions (the Pinkerton, MFS, and Mesa Actions).  Catanzarite does not suggest these directors lacked authority to retain Winget as CTI's corporate counsel in these lawsuits.  It offers no distinction between CTI's retention of Winget from the decision to hire Horwitz.

23

the briefs, and as evidenced by the pleadings in multiple lawsuits, the O'Connor Faction's control over CTI is a hotly contested issue. Thus, the O'Connor Faction's authority to hire Catanzarite and defend CTI's choice of counsel is necessarily the same legal rights afforded to the Probst Faction, who hired Horwitz to act as corporate counsel (and challenge Catanzarite). We conclude that because the chief fiduciary duty at stake is loyalty, CTI had standing to file the motion to disqualify one of its attorneys regardless of which shareholder faction *currently* claimed to control CTI.

We reject Catanzarite's argument the court was required to determine *before trial* the issue of which shareholder faction rightfully controlled CTI before ruling on CTI's disqualification motion. The trial court wisely understood the relevant facts pertaining to disqualification were undisputed. The parties agreed the two factions of shareholders were promoting very different agendas for CTI's operations. As mentioned, the O'Connor Faction sought to nullify actions taken by the prior board of directors (the Probst Faction). This included cancelling shares and voting rights, voiding contracts, repaying money owed to MFS, and changing CTI's business relationship with FinCanna. On the other hand, the Probst Faction was fighting to remain in control and maintain the status quo of voting rights, shares, financial obligations, and contracts with FinCanna. Due to the undisputed contentious nature of their dispute, it would be absurd to suggest the same attorney could simultaneously represent these two factions of shareholders. Similarly, there was no need to determine which faction controlled CTI to disqualify an attorney simultaneously purporting to act as corporate counsel while pursuing a derivative action filed against the corporation. If the interests of these two clients were in accord, there would be no need for a derivative action. (*Shen, supra,* 212 Cal.App.4th at p. 58.)

As mentioned earlier, although disqualification motions are generally reviewed for abuse of discretion, "where there are no material disputed factual issues, the appellate court reviews the trial court's determination as a question of law. [Citation.]"

24

(*SpeeDee Oil, supra,* 20 Cal.4th at p. 1144.)  Here, the trial court correctly determined *it need not* "reach the issue" of which shareholder faction rightfully controlled CTI.  We agree.  The undisputed nature of the lawsuits, involving parties with conflicting interests, and a corporation with adversarial directors, supported mandatory disqualification as a matter of law.

B.  *Adverse Interests*

Catanzarite asserts the trial court exacerbated its abuse of discretion by finding it was representing interests adverse to CTI.  Catanzarite suggests its legal maneuverings, undertaken on behalf of the O'Connor Faction, actually benefitted the corporation.  For example, Catanzarite maintains the Mesa Action plaintiffs' receivership motion would prevent corporate waste.  This and similar contentions CTI benefitted from Catanzarite's legal tactics are disingenuous.  This is not a case where Catanzarite was comprised of neutral lawyers, hired by a cohesive board of directors.

The record plainly shows MFS shareholders (the O'Connor Faction) hired Catanzarite to regain shares and control of CTI through litigation and by removing and replacing the Probst Faction from CTI's then board of directors.  Indeed, it is undisputed that within six months, Catanzarite filed three separate shareholder derivative actions all designed to give its clients more control over CTI and to revoke business decisions made by directors from the Probst Faction.  Catanzarite's involvement in these derivative actions, in which a corporation must remain neutral, highlights critical issues regarding its fiduciary duty of loyalty.  Particularly troubling was Catanzarite's active role in helping its clients forcibly remove CTI's directors, after Catanzarite was unable to achieve this same result in the MFS Action's section 709 hearing.

Even if we assume the transition of power was executed correctly with written consents, the scheme clearly demonstrated an allegiance to one faction of shareholders and corporate counsel's professional responsibilities and allegiances are owed to the corporate entity, not the officers, directors, or shareholders.  (See *La Jolla*

25

*Cove, supra,* 121 Cal.App.4th at p. 784.) As stated earlier, "[O]nce a conflict has arisen between a corporation and one or more of its officers, directors or shareholders, corporate counsel may not simultaneously represent the corporation and the adverse officer, director or shareholder." (*Id.* at p. 785; see Rules Prof. Conduct rule 1.7.)

We found other evidence of Catanzarite's conflicting loyalties after comparing the complaints Catanzarite prepared for the Mesa Action (a derivative lawsuit) with the one used for CTI in the FinCanna Action. Large sections appear to have been cut and pasted from one to the other. Perhaps Catanzarite believed the mirror complaints filed on behalf of different clients were appropriate due to its theory the derivative action, filed "on behalf of" CTI, would necessarily benefit the corporation. This assertion demonstrates its misunderstanding of derivative actions and the limited role of counsel representing the outsider shareholder plaintiffs. As mentioned earlier in this opinion, the *Shen* case is instructive on attorney client relationships arising from derivative actions. (*Shen, supra,* 212 Cal.App.4th at pp. 56-57.) That case involved three related actions and concerned a dispute between 50/50 shareholders over control of a closely held corporation. (*Id.* at p. 52.) The trial court denied one co-president's (Miller) motion to disqualify the other co-president's (Shen) attorney. (*Ibid.*) Miller filed the motion after Shen filed a petition for court supervision of voluntary winding up proceedings, as well as a complaint derivatively on behalf of the company. (*Id.* at pp. 52-53.) Miller recognized Shen lacked a formal attorney-client relationship with the company, but he argued for automatic disqualification. He reasoned disqualification was necessary due to the attorney's role in prosecuting the derivative action, which involved representing the interests of the corporation, while at the same time the attorney took an adverse position to the company in related litigation (winding up proceedings). (*Id.* at pp. 56-57.)

The *Shen* court clarified the limited significance of the "on behalf of" language commonly utilized when referring to shareholder derivative lawsuits. "[A] shareholder may only bring a derivative suit on behalf of the corporation if the

26

corporation has refused to pursue the claim. In bringing the derivative action, the shareholder's attorney is acting *against* the corporation's wishes. [¶] Nevertheless, should the shareholder prevail in the derivative action, the corporation is the ultimate beneficiary. [Citation.] Therefore, the corporation must be joined in the action . . . as a nominal defendant because of 'its refusal to join the action as a plaintiff. [Citation.]' [Citation.] In other words, in a shareholder derivative suit, '"[t]he corporation has traditionally been aligned as a defendant because it is in conflict with its stockholder about the advisability of bringing suit . . . ." [Citation.]' [Citation.]" (*Shen, supra,* 212 Cal.App.4th at p. 58, italics added.) The court cautioned the corporation that is the subject of a derivative action ""'must remain neutral in [the] action." [Citation.]' [Citation.]" (*Id.* at p. 58.) Thus, Catanzarite's role in bringing the derivative action conflicts with the corporation's obligation to remain neutral in the action. Filing the lawsuit was an act against the corporation's wishes. Thus, Catanzarite's decision to reuse the same derivative type claims in a cross-complaint, filed directly by the corporation in a different lawsuit against a third party, was plainly disloyal to the corporation (regardless of whether the directors were recently replaced).

C. *Waivers*

Catanzarite suggests we can ignore any conflicts arising from the concurrent representation of members of the O'Connor Faction and CTI because Pinkerton, Cooper, Mebane, Mesa, CTI and MFS waived any conflicts. As pointed out by CTI's counsel on appeal, Catanzarite obtained these waivers in December 2019, after the trial court's November hearing/ruling disqualifying Catanzarite from representing CTI. Catanzarite does not address this issue. It fails to explain why it could file five lawsuits (for and against CTI) before obtaining the waivers. Moreover, Catanzarite does not explain why these waivers would be relevant to a *mandatory* disqualification for ongoing concurrent representation of clients with conflicting interests.

27

Once again, Catanzarite ignores the problem with its dual representation in this case and that the O'Connor Faction cannot waive the conflict on behalf of the inanimate corporate entity, CTI. "[While] in some circumstances multiple representation may be permissible if both clients are fully informed of potential conflict and the parties consent to the representation. This consent rationale seems peculiarly inapplicable to a derivative suit, because the corporation must consent through the directors, who, as in the present case, are the individual defendants. [Citations.]" (*Forrest v. Baeza* (1997) 58 Cal.App.4th 65, 76-77 (*Forrest*).) The directors and the corporation cannot act independently of each other. (*Id.* at p. 76.)

Stated another way, "'[A]n inanimate corporate entity, which is run by directors who are themselves defendants in the derivative litigation, cannot effectively waive a conflict of interest as might an individual under applicable professional rules such as [rules] 3-600(E) and 3-310.' One commentator noted: 'But it would be meaningless in derivative litigation to allow the consent of the parties defendant to exculpate the practice of dual representation, for most often it would be the defendant directors and officers who would force the corporation's consent.' (Comment, Independent Representation for Corporate Defendants in Derivative Suits (1965) 74 Yale L.J. 524, 528.)" (*Forrest, supra,* 58 Cal.App.4th at p. 77, capitalization and italics omitted.)

Catanzarite appears to be arguing concurrent representation was possible because after the O'Connor Faction asserted control of the corporation, these shareholders effectively became insiders of the corporation. This is twisted logic. A shareholder only needs to file a derivative action, on the company's behalf, when the insiders who control the company refuse to do so. (*Beachcomber Management, supra,* 13 Cal.App.5th at p. 1118.) By filing the derivative action, Catanzarite implicitly acknowledged its clients are outsiders with interests adverse to CTI's directors. Having

28

sided with the O'Connor Faction early on, the appearance of impropriety compels disqualification.

If this case involved a deadlocked corporation, Catanzarite would have needed to secure written consent from all directors before continuing as corporate counsel. "An attorney who is asked by an officer/director to represent the corporation on a matter over which the board is deadlocked, or otherwise sharply divided, should obtain *each board member's* informed written consent to act as corporate counsel. If that consent cannot be obtained, the attorney must withdraw from representing the corporation: The attorney cannot purport to act as corporate counsel when in fact he or she is representing one faction of the board against another. [Citations.]" (Friedman, Cal. Practice Guide: Corporations (The Rutter Group 2021) ¶ 1:11.1e.) The same principles apply in this case. For several years, the CTI board of directors, comprised of both O'Connor and Probst Faction members, have been sharply divided on many issues. Accordingly, an attorney wishing to become corporate counsel, but who has an existing client at odds with some of the corporation's directors, would need more than the existing client's written waivers to concurrently represent the corporation.

V. *The Mesa Action Plaintiffs*

Catanzarite maintains the trial court abused its discretion in disqualifying it as counsel for the Mesa Action plaintiffs. We note the Mesa Action plaintiffs did not file an appeal. We do not know if these shareholders agreed with the court's ruling and have retained new counsel. CTI's respondent's brief does not address the issue. In any event, we conclude the court's ruling was correct with respect to the Mesa Action plaintiffs.

In its ruling, the court concluded the same principles preventing Catanzarite from representing CTI in the FinCanna Action prevented it from representing "plaintiffs in the derivative action *on behalf of* CTI, meaning that its representation is for the benefit of CTI." (Italics added.) As discussed earlier in this opinion, the derivative action was filed *against* CTI's wishes. (*Shen, supra,* 212 Cal.App.4th at pp. 57-58.) The derivative

29

action's "on behalf of" language signifies only a mere possibility the corporation may benefit from the litigation's outcome and should not be confused with which party holds an expectation of loyalty from Catanzarite. Thus, we disagree with the notion Catanzarite was representing CTI in the Mesa Action. Nevertheless, disqualification was appropriate.

In reaching this conclusion, we reject Catanzarite's argument the court abused its discretion by failing to determine whether the Probst Faction or the O'Connor Faction controlled CTI and had authority to retain counsel. Disqualification in the Mesa Action was appropriate under either scenario. If the O'Connor Faction gained control of CTI and hired Catanzarite, the firm still could not concurrently represent derivative shareholders at the same time it was representing a corporation experiencing conflict between those same derivative shareholders and others. Prosecuting the derivative action also clearly conflicts with a corporate counsel's duty to remain neutral in the derivative action. (*Shen, supra,* 212 Cal.App.4th at pp. 57-58.) Similarly, if the Probst Faction never lost control of CTI, then there were certainly problems created by Catanzarite's unauthorized litigation on the corporation's behalf. However, we consider the fact most relevant to CTI's disqualification motion in the Mesa Action, was CTI's newly created status as Catanzarite's former client (following the firm's disqualification in the FinCanna Action). As a former client, CTI, a defendant in the Mesa Action, had standing to challenge the firm's representation of plaintiffs having adverse interests from CTI. CTI, under the direction of the Probst Faction would certainly never give Catanzarite informed written consent to represent outsider shareholders suing the corporation and board members. Catanzarite tainted all litigation involving CTI after purporting to represent the corporation and at the same time prosecuting a derivative shareholder action against CTI.

DISPOSITION

We affirm the court's orders disqualifying Catanzarite from representing CTI, CTI Subsidiaries, and the group of shareholder plaintiffs in the Mesa Action. Respondent shall recover its costs on appeal.


O'LEARY, P. J.

WE CONCUR:


BEDSWORTH, J.


FYBEL, J.